## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DARREN B. McMILLAN,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:18cv00032 |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Darren B. McMillan, ("McMillan"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McMillan protectively filed his application for DIB on May 6, 2014, alleging disability as of April 10, 2014, based on chronic obstructive pulmonary disease, ("COPD"); depression; anxiety; degenerative disc disease in his back and neck; arthritis in his spine; bulging discs in his lower back; neck and right shoulder problems; bilateral hearing loss; ulcers; gout; and low testosterone. (Record, ("R."), at 13, 210-11, 249.) The claim was denied initially and upon reconsideration. (R. at 13, 110-12, 116-18, 121-24, 126-28.) McMillan then requested a hearing before an administrative law judge, ("ALJ"). (R. at 129-30.) The ALJ held a hearing on June 1, 2017, at which McMillan was represented by counsel. (R. at 45-78.)

By decision dated August 2, 2017, the ALJ denied McMillan's claim. (R. at 13-38.) The ALJ found that McMillan meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 15.) The ALJ found that McMillan had not engaged in substantial gainful activity since April 10, 2014, the alleged onset date.[2] (R. at 15.) The ALJ found that McMillan had severe impairments, namely cervical spine spondylosis; right shoulder impingement; status-post surgery; lumbar spine degenerative changes; cubital

---

[2] Therefore, McMillan must show that he was disabled between April 10, 2014, the alleged onset date, and August 2, 2017, the date of the ALJ's decision, in order to be eligible for benefits.

tunnel syndrome; obstructive sleep apnea, ("OSA"); COPD; and obesity, but she found that McMillan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16, 18.) The ALJ found that McMillan had the residual functional capacity to perform light work[3] that required no more than occasional pushing and pulling with the bilateral upper extremities, climbing of ramps and stairs, balancing, stooping, kneeling, crouching and reaching overhead bilaterally; that did not require crawling, climbing of ladders, ropes or scaffolds, exposure to hazardous machinery, work at unprotected heights, work on vibrating surfaces and driving, as part of the job; that required no more than frequent performance of handling, feeling, fingering and all other reaching; and that did not require even moderate exposure to extreme temperatures. (R. at 19.) The ALJ found that McMillan was unable to perform his past relevant work. (R. at 35.) Based on McMillan's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that McMillan could perform, including jobs as an assembler, a bottling line attendant and a sorter. (R. at 36-37.) Thus, the ALJ concluded that McMillan was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 37.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued her decision, McMillan pursued his administrative appeals, (R. at 308-10), but the Appeals Council denied his request for review. (R. at 1-5.) McMillan then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

404.981 (2019). This case is before this court on McMillan's motion for summary judgment filed February 25, 2019, and the Commissioner's motion for summary judgment filed May 20, 2019.

## II. Facts

McMillan was born in 1963, (R. at 51, 210), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). McMillan has a high school education, vocational training in welding and past work experience as a bridge supervisor. (R. at 51-52, 250.) McMillan stated that he had not received counseling or therapy for his symptoms of depression. (R. at 53.)

John Newman, a vocational expert, also was present and testified at McMillan's hearing. (R. at 70-77.) Newman classified McMillan's past work as an bridge repairer as heavy[4] and skilled. (R. at 71-72.) Newman was asked to consider a hypothetical individual of McMillan's age, education and work history, who could perform light work that did not require more than occasional pushing and pulling with the bilateral upper extremities, climbing of ramps and stairs, balancing, stooping, kneeling, crouching and reaching overhead bilaterally; that did not require crawling, exposure to hazardous machinery, work at unprotected heights, climbing of ladders, ropes or scaffolds and work on vibrating surfaces; that did not require more than frequent handling, feeling, fingering and all other reaching; that did not require even moderate exposure to extreme temperatures,

---

[4] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2019).

excessive humidity and pulmonary irritants; and that did not require driving as part of the job. (R. at 72.) Newman testified that such an individual could not perform McMillan's past work, but could perform other work existing in significant numbers in the national economy, including jobs as an assembler, a packer and a bottling line attendant. (R. at 72-73.) Newman next was asked to consider the same individual, but who would be limited to lifting and carrying 10 pounds occasionally and five pounds frequently and who could walk for only three hours in an eight-hour workday. (R. at 73-74.) He stated that the individual could not perform McMillan's past work. (R. at 74.)

Newman then was asked to consider hypothetical individual number one, but who could use his left arm, occasionally, his right arm less than occasionally and never use the right arm for repetitive functions. (R. at 75-76.) He stated that there would be no jobs available that such an individual could perform. (R. at 76.) When asked if the individual would be off task more than 10 percent of the workday, Newman stated that there would be no jobs available that such an individual could perform. (R. at 77.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Alan D. Entin, Ph.D., a state agency psychologist; Dr. Patricia Staehr, M.D., a state agency physician; Dr. Loen C. Bass, M.D.; Appalachian Orthopaedic Associates, P.C.; Mountain States Rehabilitation; Wellmont CVA Heart Institute; Dr. R. Michael Moore, M.D.; Janice F. Ewing, N.P., a nurse practitioner; Norton Community Hospital; Wellmont Holston Valley Medical Center, ("Holston Valley"); Associated Orthpaedics of Kingsport, P.C.; Wellmont Medical Associates; and East Tennessee Brain and Spine Center, P.C.

The record shows that Dr. R. Michael Moore, M.D., treated McMillan from April 13, 2006, through March 20, 2017, for complaints of neck stiffness; left shoulder injury; right shoulder pain; hypotension; low heart rate; chronic back strain; cervical strain; and COPD. (R. at 441-70, 481-500, 515-42, 680-869, 944-48.) During the time period of 2006 through 2012, respiratory examinations showed that McMillan could breathe without effort; his chest expanded symmetrically upon inspiration; he had no tenderness or masses; his lungs were clear to percussion; and he had no crackles, wheezes, rhonchi, stridor or pleural rubs. (R. at 685, 690-705, 863.) McMillan's cardiovascular examinations were normal. (R. at 686, 690-705, 863.) McMillan's musculoskeletal examinations showed bilateral low back tenderness and muscle spasm; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 685, 703.)

On January 17, 2012, x-rays of McMillan's thoracic spine were normal with the exception of nominal spondylosis. (R. at 387-88.) X-rays of McMillan's cervical spine showed nominal spondylosis at the T1 level and mild disc space narrowing at the C4-C5 and C5-C6 disc space with nominal anterior osteophytes. (R. at 388-89.) X-rays of McMillan's lumbar spine showed a healing mild subacute superior endplate compression fracture at the L1 level and subacute versus chronic mild fracture at the T12 level. (R. at 389-90.)

On March 8, 2012, Dr. Michael S. Dew, M.D., a neurologist, evaluated McMillan for his complaints of low back pain and intermittent hand numbness and weakness. (R. at 584-86.) Examination showed normal bulk, tone and strength throughout; he had intact sensation; and he had a normal gait. (R. at 585.) Dr. Dew

diagnosed intermittent hand numbness and weakness, cervical pain and lumbar pain with mild L1 compression fracture. (R. at 585.) On March 23, 2012, an electroneuromyography, ("ENMG"), and nerve conduction study showed a slight reduction in the left median transcarpal response amplitude and mild findings of a left ulnar mononeuropathy. (R. at 581-83.) On March 27, 2012, an ultrasound of McMillan's upper extremities showed no evidence of arterial insufficiency. (R. at 637.) On April 10, 2012, an MRI of McMillan's lumbar spine showed focal endplate deformity with adjacent medullary edema superior at the T12 level, most likely representative of a subacute Schmorl's node with disc material herniating through the subchondral bone; minor chronic benign superior plate compression fractures at the T12 and L1 levels; degenerative disc changes most extensive at the L5-S1 level; and facet degenerative changes at the L4-L5 and L5-S1 levels. (R. at 386-87.)

Throughout 2013, Dr. Leon C. Bass, M.D., treated McMillan for COPD. (R. at 311-24, 381-83, 471-73.) Dr. Bass noted that McMillan's COPD was stable and that his pulmonary functional capacity test demonstrated only mild COPD. (R. at 315, 317, 322, 381, 473.)

On April 15, 2013, and May 3, 2013, McMillan was seen at Wellmont CVA Heart Institute for complaints of fatigue and arrhythmias. (R. at 392-400.) McMillan's cardiac, pulmonary and musculoskeletal examinations were normal. (R. at 398.) An echocardiogram was normal. (R. at 392, 613-14.) A treadmill test showed no evidence of inducible arrhythmias or ischemic changes. (R. at 392, 395.) Results of a Holter monitor showed no significant arrhythmias. (R. at 392, 407.) McMillan was diagnosed with sinus bradycardia, fatigue/malaise and OSA.

(R. at 393.) On May 14, 2013, x-rays of McMillan's chest showed no active disease. (R. at 436.)

On May 29, 2013, Dr. Danny A. Mullins, M.D., a physician with Appalachian Orthopaedic Associates, P.C., saw McMillan for his complaints of right shoulder pain. (R. at 325-26.) Dr. Mullins reported that McMillan had full range of motion of the right shoulder; he had mildly positive impingement; he had good strength; he had a positive Tinel's sign over the cubital tunnel at the elbow; and he had good range of motion of all hand digits. (R. at 325.) X-rays of McMillan's right shoulder showed mild acromioclavicular, ("AC"), degenerative joint disease. (R. at 325.) Dr. Mullins diagnosed shoulder joint pain and shoulder bursitis. (R. at 326.) On June 26, 2013, Dr. Mullins reported that McMillan had full range of motion of the right shoulder; he had mildly positive Spurling's test with respect to the cervical spine; he was neurovascularly intact; and he had positive impingement and pain with resisted abduction, but he had good strength. (R. at 328.)

In August 2013, McMillan reported that his shoulder was "better," and he believed he could return to work. (R. at 467.) Dr. Moore released McMillan to return to work on August 19, 2013. (R. at 469.) On December 18, 2013, an MRI of McMillan's cervical spine showed mild multi-level spondylosis with multi-level intervertebral canal narrowing, greatest at the C5-C7 disc space on the right. (R. at 384.) Throughout 2013, Dr. Moore reported that respiratory examinations showed that McMillan could breathe without effort; his chest expanded symmetrically upon inspiration; he had no tenderness or masses; his lungs were clear to percussion; and he had no crackles, wheezes, rhonchi, stridor or pleural rubs. (R. at 454, 460, 464, 468, 491, 495, 499.) McMillan's cardiovascular examination was

normal. (R. at 454, 460, 464, 468, 491, 495, 499.) McMillan's musculoskeletal examination showed bilateral low back tenderness and muscle spasm; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 454-55, 460-61, 464, 468, 491, 495, 499.)

On July 7, 2014, Janice F. Ewing, N.P., a nurse practitioner with Wellmont Medical Associates, saw McMillan for his complaints of COPD. (R. at 550-52.) McMillan reported that he was on short-term disability due to shoulder and neck problems. (R. at 550.) Ewing reported that McMillan's pulmonary and cardiovascular examinations were normal. (R. at 551.)

On August 11, 2014, Dr. Moore reported that McMillan's respiratory examination revealed bibasilar rales and decreased breath sounds in all lung fields. (R. at 524.) McMillan's cardiovascular examination was normal. (R. at 524.) McMillan's musculoskeletal examination showed bilateral low back tenderness, muscle spasm and decreased range of motion; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 524.) Dr. Moore opined that McMillan was totally and permanently disabled due to COPD, OSA and problems with his shoulder and cervical and lumbar spine. (R. at 525.) Dr. Moore's examination findings remained largely unchanged throughout 2014.[5] (R. at 442-43, 446, 450, 524, 528-29, 532-33, 536-37, 788, 793, 798, 803.)

_____

[5] In November and December 2014, Dr. Moore additionally noted tenderness over the biceps tendon and subacromial bursa. (R. at 532-33, 536-37, 788, 793.)

On October 15, 2014, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that McMillan had a nonsevere anxiety disorder. (R. at 86-87.) He found that McMillan had no restrictions on his activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace, and he had experienced no repeated episodes of extended-duration decompensation. (R. at 86.)

On October 15, 2014, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding that McMillan could perform light work. (R. at 88-90.) He found that McMillan was limited to occasionally pushing and pulling with his right upper extremity. (R. at 88.) Dr. Spetzler opined that McMillan could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes or scaffolds. (R. at 88-89.) He found that McMillan could only frequently perform bilateral overhead reaching. (R. at 89.) No visual or communicative limitations were noted. (R. at 89.) Dr. Spetzler opined that McMillan should avoid concentrated exposure to extreme cold, pulmonary irritants and hazards, such as machinery and heights. (R. at 89-90.)

On November 20, 2014, an MRI of McMillan's right shoulder showed a narrowed subacromial arch, secondary to osseous hypertrophy of the AC joint, with mild impression on the distal supraspinatus tendon at the musculotendinous junction. (R. at 508-09.)

On December 11, 2014, Dr. Billy K. Parsley, M.D., a physician with Associated Orthopaedics of Kingsport, P.C., evaluated McMillan for his complaints of right shoulder pain, which dated back to a 2011 all-terrain vehicle crash. (R. at 641.) Dr. Parsley reported that McMillan was in no acute distress; he

had a normal gait and good coordination; his musculoskeletal examination showed a normal form and contour of the shoulders with limited range of motion; he had intact strength; his impingement examination was positive; and he was grossly neurovascularly intact at the hands. (R. at 641.) Dr. Parsely diagnosed right shoulder impingement. (R. at 641.) Dr. Parsley suggested surgical debridement and decompression. (R. at 641.)

On January 9, 2015, McMillan underwent an arthroscopic distal clavicle excision of the right shoulder and an arthroscopic subacromial decompression of the right shoulder. (R. at 626-29.) On January 15, 2015, McMillan reported improvement in both pain and motion since his right shoulder surgery. (R. at 781.) On February 23, 2015, an EMG showed mild bilateral ulnar neuropathies at the elbow region. (R. at 634-36.) On March 3, 2015, McMillan reported that his shoulder was doing well. (R. at 639.) Dr. Parsley reported that McMillan's shoulder range of motion was improved, and he was neurovascularly intact. (R. at 639.) Dr. Parsley recommended nonsurgical treatment of McMillan's bilateral cubital tunnel syndrome and noted that McMillan could continue regular activities. (R. at 639.)

On April 10, 2015, x-rays of McMillan's chest were normal. (R. at 567.) On June 24, 2015, a pulmonary function test showed McMillan's forced expiration volume one second, ("$FEV_1$"), to be 4.80 percent, 80 percent of the predicted $FEV_1$. (R. at 569.) The $FEV_1$ and forced vital capacity, ("FVC"), was 80 percent, with a predicted $FEV_1/FVC$ of 73 percent. (R. at 569.)

On June 26, 2015, Dr. Patricia Staehr, M.D., a state agency physician, completed a medical assessment, finding that McMillan could perform light work.

(R. at 100-03.) She found that McMillan was limited to occasionally pushing and pulling with his right upper extremity. (R. at 101.) Dr. Staehr opined that McMillan could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes or scaffolds. (R. at 101.) She found that McMillan could only occasionally perform bilateral overhead reaching. (R. at 102.) No visual or communicative limitations were noted. (R. at 102.) Dr. Staehr opined that McMillan should avoid concentrated exposure to extreme cold and heat, humidity, pulmonary irritants and hazards, such as machinery and heights. (R. at 102.)

On June 29, 2015, Alan D. Entin, Ph.D., a state agency psychologist, completed a PRTF, indicating that McMillan had a nonsevere anxiety disorder. (R. at 98-99.) He found that McMillan had no restrictions on his activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace, and he had experienced no repeated episodes of extended-duration decompensation. (R. at 99.)

On July 15, 2015, Dr. Moore completed a medical assessment, indicating that McMillan could lift and carry items weighing up to five pounds occasionally and two pounds frequently; stand and/or walk for a total of three hours in an eight-hour workday, but could do so for up to 20 minutes without interruption; sit for a total of three hours in an eight-hour workday, but could do so for up to 30 minutes without interruption; never climb, stoop, kneel, balance, crouch or crawl; he had a limited ability to reach; and had a limited ability to work around heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration. (R. at 575-77.) Dr. Moore opined that McMillan would be absent from work more than two days a month. (R. at 577.) That same day, Dr. Moore completed a mental

assessment, finding that McMillan had a seriously limited to no useful ability in all areas of occupational, performance and personal/social adjustments. (R. at 648-50.)

On July 17, 2015, Ewing reported that McMillan's cardiovascular and pulmonary examinations were normal, and his musculoskeletal examination showed no edema or tenderness. (R. at 878.) A pulmonary function test showed mild obstruction, which improved with bronchodilator. (R. at 878.)

On September 16, 2015, McMillan complained of pain in his back, buttocks and right flank. (R. at 768-72.) He also reported numbness of the right leg. (R. at 768.) Dr. Moore reported that McMillan's respiratory examination revealed bibasilar rales and decreased breath sounds in all lung fields. (R. at 770.) McMillan's cardiovascular examination was normal. (R. at 770.) McMillan's musculoskeletal examination showed bilateral low back tenderness, muscle spasm and decreased range of motion; his right shoulder showed no signs of muscle atrophy or erythema, normal range of motion, and testing for rotator cuff injury and thoracic outlet syndrome was normal; his right shoulder displayed pain with abduction and external rotation, tenderness over the biceps tendon and subacromial bursal tenderness; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 770.) Dr. Moore's examination findings remained unchanged throughout 2015. (R. at 760, 765, 770, 778, 783.)

On November 11, 2015, Dr. Weihong Pan, M.D., a physician with Wellmont Medical Associates, evaluated McMillan for sleep apnea. (R. at 884-85.) Pulmonary examination showed no rales, but sporadic wheezes were noted; his

cardiovascular examination was normal; he had tenderness in the cervical and lumbar spine; his extremities showed normal and symmetric movement without joint swelling; he had a normal gait, muscle tone and strength in all extremities; and he had intact sensation. (R. at 885.) On January 6, 2016, Dr. Pan diagnosed McMillan with OSA syndrome. (R. at 880-83.) On April 15, 2016, it was noted that McMillan's OSA improved with treatment, and his chronic airway obstruction was controlled with inhalers. (R. at 892, 896.)

On March 21, 2016, and June 14, 2016, McMillan complained of chronic cervical strain. (R. at 748-57.) Dr. Moore reported that McMillan's respiratory examination revealed bibasilar rales and decreased breath sounds in all lung fields. (R. at 750, 755.) McMillan's cardiovascular examination was normal. (R. at 750, 755.) McMillan's musculoskeletal examination showed bilateral low back tenderness, muscle spasm and decreased range of motion; his right shoulder showed no signs of muscle atrophy or erythema, normal range of motion, and testing for rotator cuff injury and thoracic outlet syndrome was normal; his right shoulder displayed pain with abduction and external rotation, tenderness over the biceps tendon and subacromial bursal tenderness; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 750, 755.) Dr. Moore's examination findings remained unchanged throughout 2016. (R. at 739, 745.)

On July 18, 2016, Dr. Mark W. Emery, M.D., a physician with Wellmont Medical Associates, reported that McMillan's pulmonary, cardiovascular and musculoskeletal examinations were normal. (R. at 901.) He noted that McMillan's

asthma was controlled with a bronchodilator, and his sleep apnea was adequately treated. (R. at 901.) A pulmonary function test was normal. (R. at 908.)

On March 13, 2017, Jill Henritze, PA-C, a physician's assistant with Associated Orthopaedics of Kingsport, P.C., saw McMillan for evaluation of his right shoulder. (R. at 916-18.) Henritze reported that McMillan had good range of motion of the neck; he had decreased range of motion of the right shoulder; and intact sensation. (R. at 917-18.) X-rays of McMillan's cervical spine showed some degenerative changes at the C4-C5 and C5-C6 disc spaces. (R. at 917.) X-rays of McMillan's right shoulder were normal. (R. at 917.) Henritze diagnosed cervicalgia with right arm and shoulder radiculopathy. (R. at 917.) An MRI of McMillan's neck was ordered. (R. at 917.)

On March 20, 2017, Dr. Moore reported that McMillan's respiratory examination revealed bibasilar rales and decreased breath sounds in all lung fields. (R. at 945.) McMillan's cardiovascular examination was normal. (R. at 945.) McMillan's musculoskeletal examination showed bilateral low back tenderness, muscle spasm and decreased range of motion; his right shoulder showed no signs of muscle atrophy or erythema, normal range of motion and testing for rotator cuff injury and thoracic outlet syndrome was normal; his right shoulder displayed pain with abduction and external rotation, tenderness over the biceps tendon and subacromial bursal tenderness; his cervical spine was within normal limits; he had normal range of motion and muscle strength in all major muscle groups; and he had tenderness, spasm and limited range of motion of the trapezius and shoulder. (R. at 945-46.)

On March 20, 2017, Dr. Moore completed a mental assessment, indicating that McMillan had a satisfactory ability to follow work rules; to function independently; to understand, remember and carry out detailed and simple job instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 952-54.) He opined that McMillan had a seriously limited ability to relate to co-workers; to use judgment; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 952-53.) Dr. Moore opined that McMillan had no useful ability to deal with the public; to interact with supervisors; and to deal with work stresses. (R. at 952.) He found that McMillan would be absent from work more than two days a month due to his impairments. (R. at 954.) He opined that McMillan was totally and permanently disabled. (R. at 954.)

That same day, Dr. Moore completed a medical assessment, indicating that McMillan could lift and carry items weighing up to five pounds occasionally and two pounds frequently; stand and/or walk for a total of two hours in an eight-hour workday, but could do so for up to 15 minutes without interruption; sit for a total of three hours in an eight-hour workday, but could do so for up to 20 minutes without interruption; never climb, stoop, kneel, balance, crouch or crawl; he was unable to reach, to handle and to push and pull; and he had a limited ability to work around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 957-59.) Dr. Moore opined that McMillan would be absent from work more than two days a month. (R. at 959.)

On March 23, 2017, an MRI of McMillan's cervical spine showed mild disc protrusion extending into the right neuroforamen at the C6-C7 disc space; small

disc protrusions posterolaterally on the right and left C6-C7 disc space; and no spinal stenosis or cord compression was noted. (R. at 911.) On April 3, 2017, Henritze referred McMillan to a neurosurgeon. (R. at 915.)

On April 13, 2017, Dr. Erin Douglas, PA-C, a physician assistant with East Tennessee Brain and Spine Center, P.C., saw McMillan for his complaints of cervical pain and right upper extremity pain. (R. at 929-32.) Examination showed normal motor strength in the bilateral upper extremities with grip strength, biceps, triceps and deltoids; he had some slight give-away weakness to the right deltoid, as well as with abduction and adduction to his right shoulder; he had decreased range of motion with extension and lateral rotation to the right of the neck; he had some tenderness to palpation of the right paraspinous musculature and the right trapezius extending towards the shoulder; he had some decreased passive range of motion to the right shoulder secondary to pain; he had a nonantalgic gait; and he had a positive Tinel's sign at the right wrist and the left elbow. (R. at 931.) Douglas diagnosed cervical radiculopathy; cervical spondylosis without myelopathy; and neck pain. (R. at 932.) She recommended an epidural steroid injection at the C6-C7 disc space. (R. at 932.)

On April 20, 2017, Dr. Wayne McKay Woodbury, M.D., administered a cervical epidural steroid injection. (R. at 921.) He diagnosed spinal stenosis in the cervical region; degeneration of cervical intervertebral disc; neck pain; and prolapsed cervical intervertebral disc. (R. at 922-23.) On May 9, 2017, McMillan reported that the injection helped for "a day or so." (R. at 937.)  Examination showed normal motor strength in the bilateral upper extremities with grip strength, biceps, triceps and deltoids; he had some slight give-away weakness to the right triceps, as well as with abduction and adduction to his right shoulder; he had

decreased range of motion with extension and lateral rotation to the right; he had fairly good range of motion with flexion and extension on lateral rotation to the left; he had tenderness to palpation to the sternocleidomastoid muscle; and he had intact sensation. (R. at 938.) On May 26, 2017, a cervical myelogram showed severe disc degeneration at the L5-S1 level with vacuum phenomenon. (R. at 961.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

McMillan argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, McMillan argues that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Moore. (Plaintiff's Brief at 5-6.) McMillan also argues that the ALJ erred by giving controlling weight to the opinions of the state agency physicians. (Plaintiff's Brief at 6.) McMillan contends that the state agency physicians' assessments were "stale and out dated," as they were rendered in 2015. (Plaintiff's Brief at 6.)

McMillan argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 4-6.) The ALJ found that McMillan had the residual functional capacity to perform light work that required no more than occasional pushing and pulling with the bilateral upper extremities, climbing of ramps and stairs, balancing, stooping, kneeling, crouching and reaching overhead bilaterally; that did not require crawling, climbing of ladders, ropes or scaffolds, exposure to hazardous machinery, work at unprotected heights, work on vibrating

surfaces and driving, as part of the job; that required no more than frequent performance of handling, feeling, fingering and all other reaching; and that did not require even moderate exposure to extreme temperatures. (R. at 19.)

In making this residual functional capacity finding, the ALJ stated that she was giving "little weight" to Dr. Moore's opinions and giving greater weight to the state agency medical and psychological assessments (R. at 33-35.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence...." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2019).

The ALJ noted that Dr. Moore's assessments were neither well-explained nor supported by the evidence. (R. at 34.) The ALJ further noted that Dr. Moore's opinions concerning McMillan's physical limitations were inconsistent with, and did not adequately address, McMillan's positive response to shoulder surgery, conservative treatment of his other musculoskeletal and neurological complaints and his positive response to CPAP therapy. (R. at 34-35.) In 2017, McMillan had good range of motion of the neck, and his right shoulder range of motion was decreased secondary to pain. (R. at 918.) X-rays of McMillan's cervical spine

showed degenerative changes at the C4-C5 and C5-C6 levels, while x-rays of McMillan's shoulder appeared within normal limits. (R. at 917.)

In March 2017, an MRI of McMillan's cervical spine showed a mild disc protrusion, but no evidence of spinal stenosis or cord compression. (R. at 911.) McMillan was referred to a neurosurgical practice, where a certified physician assistant characterized the degenerative changes as mild and recommended an epidural steroid injection. (R. at 931-32.) In May 2017, examination showed decreased range of motion with lateral rotation to the right, but McMillan had fairly good and full range of motion with flexion and extension on lateral rotation to the left; he had some right triceps "give-away" weakness, but his motor strength was otherwise 5/5 in the upper extremities; and sensation and reflexes were grossly intact. (R. at 938.) The ALJ noted that, following surgery on his right shoulder and an epidural steroid injection to the right upper extremity, McMillan's neck and shoulder complaints were managed conservatively. (R. at 31, 626-29, 921.) Following surgery, McMillan reported improvement in both pain and motion. (R. at 781.) Dr. Parsley reported improvement in McMillan's shoulder range of motion, and he was neurovascularly intact. (R. at 639.) While McMillan had tenderness to palpation to the sternocleidomastoid muscle and decreased range of motion with extension, Douglas reported that McMillan had normal motor strength and intact sensation. (R. at 938.) Henritze reported that, although McMillan had decreased range of motion of the right shoulder, he had good range of motion of his neck and intact sensation. (R. at 917-18.)

McMillan complained of low back pain and was treated with pain medications. (R. at 684-85, 690.) Treatment notes show that, despite complaints of low back pain, McMillan presented with normal gait, coordination and sensation.

(R. at 641, 746, 885.) In May 2017, a cervical myelogram showed severe disc degeneration at the L5-S1 level, but no gross stenosis or nerve root compression. (R. at 961.)

While the state agency physicians opined that McMillan should avoid concentrated exposure to pulmonary irritants, (R. at 90, 102), the record shows that McMillan's pulmonary function tests showed only mild COPD. (R. at 381, 569.) In November 2015, Dr. Pan reported that McMillan's chronic airway obstruction was controlled with an inhaler and in April 2016, his OSA was improved with CPAP therapy. (R. at 892, 896.) In 2016, Dr. Emery noted that McMillan's pulmonary examination was normal and that his asthma was controlled. (R. at 901.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Dr. Moore noted bibasilar rales and decreased breath sounds, (R. at 750, 755, 770, 945), and he opined that McMillan had a limited ability to work around temperature extremes and humidity. (R. at 959.)

With regard to McMillan's mental limitations, Dr. Moore opined that he had a seriously limited to no useful ability in the majority of occupational, performance and personal/social adjustments. (R. at 648-50, 952-54.) The ALJ stated that these limitations were not adequately explained or supported by the record. (R. at 35.) While the record shows that McMillan has taken medication for depression for several years, the ALJ noted that he did so before the alleged onset date and during the time that he worked at a skilled job. (R. at 35, 467, 487.) There is nothing in the record to show that McMillan needed inpatient or other intensive psychiatric services. Other treating providers documented that McMillan presented with

normal mood and affect, normal behavior and normal thought content. (R. at 551, 664, 896, 901.)

The ALJ gave "great weight" to the state agency psychologists' assessments, who opined that McMillan's mental impairment was nonsevere. (R. at 33, 86, 99.) The ALJ noted that the state agency psychologists' assessments were well-supported and consistent with the totality of the evidence. (R. at 33.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, West's Social Security Reporting Service, Rulings (West 2013 Supp.) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

McMillan argues that the ALJ should have given the state agency medical and psychological consultants' assessments less weight because they were "stale and out dated," because they did not have the benefit of reviewing the assessments of his treating physician, Dr. Moore. (Plaintiff's Brief at 6.) The simple fact that those opinions came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security

regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.") It is apparent from the ALJ's very thorough decision that she carefully evaluated the whole record before her when weighing the opinion evidence, and she ultimately found the state agency medical and psychological opinions were consistent with the record as a whole. Based on this, I find that substantial evidence exists to support the ALJ's finding that McMillan had the residual functional capacity to perform light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

2. Substantial evidence exists in the record to support the Commissioner's finding that McMillan was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McMillan's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:     January 13, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE